2000 ND 226

**In the Matter of the ESTATE OF Emanuel LUTZ, Deceased.**

**Lavilla Oswald Lutz, Petitioner, Appellant and Cross–Appellee,**

v.

**Ingrid L. Schneider and Edward J. Lutz, Co–Personal Representatives of the Estate of Emanuel Lutz, Respondents, Appellees and Cross–Appellants.**

**No. 20000098.**

Supreme Court of North Dakota.

Dec. 29, 2000.

Gregory C. Larson, Wheeler Wolf, Bismarck, ND, for petitioner, appellant and cross-appellee.

Rebecca S. Thiem (argued) and James S. Hill, Zuger Kirmis & Smith, Bismarck, ND, for respondents, appellees and cross-appellants.

NEUMANN, Justice.

[¶ 1] Lavilla Lutz appealed from orders dismissing her creditor's claim against the estate of Emanuel Lutz, dismissing her petition for an elective share, homestead allowance, exempt property entitlement and family allowance, and approving the distribution of the estate. Ingrid Schneider and Edward Lutz, who are Emanuel's children and the co-personal representatives of the estate, cross-appealed from that part of an order alternatively determining the amount of supplemental income from the estate necessary to preclude Lavilla's eligibility for public assistance. We conclude the trial court did not err in dismissing Lavilla's claims and approving the distribution of the estate, rendering it unnecessary for us to address the issue raised in the cross-appeal. We affirm.

I

[¶ 2] Emanuel was born in 1924. He was married in 1947 and helped raise two children. Lavilla was born in 1931. She was married in 1949 and helped raise three children. In 1983 Emanuel's wife died and Lavilla divorced. Emanuel and Lavilla began dating in 1984. In 1986 Lavilla moved into the downstairs apartment of Emanuel's duplex in Bismarck. They began living together a short time afterward, and Emanuel paid their living expenses.

[¶ 3] The couple discussed marriage in 1987, and decided to have a premarital agreement prepared because it would be a second marriage for each of them. Emanuel wanted to make sure that, upon his death, his two Bismarck duplexes and farmland would pass to his children and grandchildren. According to Lavilla, although she knew this was a condition of their marriage, Emanuel assured her that he would provide for Lavilla outside of the premarital agreement and his will.

[¶ 4] Emanuel met with attorney Morris Tschider on May 7, 1987, and told him he wanted, upon his death, to give Lavilla the right to live in his duplex and the use of all the household goods and furnishings until she remarried or died, but to also give his children the option to buy her out of this arrangement for $15,000. Tschider gave Emanuel will questionnaire forms to complete. Emanuel took them home and worked on them with Lavilla and his daughter, Ingrid Schneider. According to Schneider, Emanuel then discussed the buy-out arrangement with them, but Lavilla denied ever discussing the arrangement with Emanuel. Emanuel and Lavilla delivered the completed forms to Tschider the following day. According to Tschider, the buy-out arrangement was discussed at the meeting and both Emanuel and Lavilla agreed to it, but Tschider advised against the arrangement, believing it would not be "workable." Lavilla testified Emanuel told her at the meeting he wanted to leave her money outside of the premarital agreement, "under the table to save it from taxes."

[¶ 5] In late May 1987, Tschider sent drafts of the premarital agreement, the consents to will, and the wills to Emanuel and Lavilla. Tschider testified he deleted the $15,000 buy-out arrangement because he believed Lavilla's "attorney would review it" and the provision would "be hard to sell." Emanuel and Lavilla made no changes to the documents and signed them during a meeting in Tschider's office more than eight months later, on February 1,

1988. The premarital agreement provided that each waived any share of the other's estate "except as provided in their respec[ti]ve Wills." It also provided that each of the parties consented to the will of the other as it then existed or as it may be amended or changed in the future. Emanuel's will bequeathed to Lavilla their resident property for her lifetime, or until she remarried.

[¶ 6] Emanuel and Lavilla were married on February 14, 1988. In August 1991, Emanuel began having health problems, and was eventually diagnosed with a heart condition. He was hospitalized for a period of time in February 1992, but made a full recovery. In January 1994, Emanuel began experiencing stomach pains, and was eventually diagnosed with colon cancer. He had surgery and was hospitalized for 10 days in April 1994. He was also hospitalized for four days in July 1994. In August 1994, Lavilla drove Emanuel to the Mayo Clinic in Rochester, Minnesota, where he was informed his cancer was terminal. Upon returning to Bismarck, the family requested and received a hospice referral. Lavilla, other family members, and hospice volunteers helped care for Emanuel until he died in his home on November 9, 1994.

[¶ 7] On January 5, 1995, Lavilla filed a creditor's claim against Emanuel's estate for the reasonable cost of services she had provided to Emanuel before his death. On January 23, 1995, Lavilla filed a petition for elective share, homestead allowance, exempt property entitlement and family allowance, which sought to invalidate the premarital agreement. The trial court granted summary judgment dismissal of both claims and approved the co-personal representatives' proposed distribution of the estate. Lavilla appealed, and we reversed. In *Matter of Estate of Lutz,* 1997 ND 82, ¶¶ 54–55, 563 N.W.2d 90 (*"Lutz I "*), we held summary judgment was inappropriate on Lavilla's claims because there were genuine issues of material fact to be resolved, and we remanded for trial.

[¶ 8] Following a trial, the court ruled Lavilla failed to prove her claim for services by a preponderance of the evidence. The court found there was no express or implied agreement for payment, the care provided was not extraordinary, and Lavilla derived significant benefits from the marriage. The trial court found Lavilla had voluntarily entered into the premarital agreement and it was valid and enforceable. The court ruled the agreement was not substantively unconscionable as executed, but concluded it was necessary to modify the effect of the premarital agreement to avoid Lavilla's eligibility for public assistance. Because there was insufficient evidence of the amount of support necessary to avoid eligibility, the court said it would hold an evidentiary hearing at a later date to determine the amount if the parties could not reach an agreement. The trial court further ruled Emanuel's will was ambiguous and the premarital agreement could be used to clarify Emanuel's intentions. The court determined Lavilla was not to receive the residuary of the estate under the will. After obtaining a N.D.R.Civ.P. 54(b) certification from the trial court, Lavilla appealed.

[¶ 9] In *Matter of Estate of Lutz,* 1999 ND 121, ¶ 1, 595 N.W.2d 590 ("*Lutz II* "), a majority of this Court held the Rule 54(b) certification was improvidently granted, and we dismissed the appeal. Following an evidentiary hearing, the trial court denied Lavilla's motion for ongoing support from the estate to avoid eligibility for public assistance. Relying on the dissent in *Lutz II,* at ¶¶ 7–13 (Glaser, S.J., dissenting), the court ruled N.D.C.C. § .14–03.1–06(2) did not apply under the circumstances, and enforcement of the premarital agreement was not clearly unconscionable under N.D.C.C. § 14–03.1–07. Alternatively, the court found $250 per month in support payments from the estate would render Lavilla ineligible for most public assistance programs. Lavilla appealed, and the co-personal representatives cross-appealed, challenging the trial court's alternative ruling $250 per month from the estate would render Lavilla ineligible for public assistance benefits.

II

[¶ 10] Lavilla contends the trial court erred in ruling she was not entitled to $38,832 in compensation from the estate for services she rendered to Emanuel during his illnesses.

[¶ 11] Although a person who performs substantial services for another without an express agreement for compensation ordinarily is entitled to the reasonable value of the services, a presumption arises that services were gratuitous and that compensation was not intended when those services are performed by a family member in the same household. *Matter of Estate of Raketti,* 340 N.W.2d 894, 901 (N.D.1983). The presumption may be overcome with evidence that the services rendered are exceptional and of an extraordinary nature. *Id.; Matter of Estate of Thompson,* 191 N.W.2d 578 syl. 1 (N.D. 1971). Mutuality of benefits is also a factor to consider. *Lutz I,* at ¶ 21. A family claimant has the burden of overcoming the presumption against compensation by proof that the services were extraordinary and not gratuitous. *Id.* at ¶ 17.

[¶ 12] The issue of whether the services are so exceptional and extraordinary as to imply a contract to pay for those services is a question of fact for the trier of fact to decide. *Lutz I,* at ¶ 19; *Raketti,* 340 N.W.2d at 902–03. A trial court's findings of fact will not be set aside unless they are clearly erroneous under N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law or, although there is some evidence to support it, on the entire record we are left with a definite and firm conviction a mistake has been made. *Matter of Estate of Sagmiller,* 2000 ND 151, ¶ 6, 615 N.W.2d 567.

[¶ 13] The trial court ruled there was no express or implied agreement for

compensation, finding "the extent of care provided by [Lavilla] has been overstated by her and the degree of assistance from others in the family has been minimized. Additionally, much of the care referred to would not fall into the extraordinary category and would have been the typical household responsibilities, including meal preparation and cleaning." The court further ruled there was mutuality of benefits, finding Lavilla "derived significant benefits from the marriage, including [Emanuel's] ongoing companionship, opportunities for travel and engagement in activities, including card playing and dancing, which the couple enjoyed." Although Lavilla claimed she injured her back helping Emanuel and can no longer fully support herself financially, the trial court found the "record of back problems which she had prior to the time she assisted [Emanuel] physically in the latter stages of his life certainly detract from her claim that she sustained injuries as a result of her care of Emanuel. The extensive medical records . . . indicate not only chronic back problems, but a tendency on her part to overstate or misrepresent regarding the back problems." The court noted exceptional and extraordinary care was required only "the last few weeks of [Emanuel's] life, and then much of the physical care was being provided by the Hospice workers, as well as Edward Lutz and Ingrid and Andy Schneider."

[¶ 14] The trial court was presented with conflicting evidence on the extent and nature of the care provided by Lavilla to Emanuel before he died. We give due regard to the trial court's opportunity to assess the credibility of the witnesses, and the court's choice between two permissible views of the weight of the evidence is not clearly erroneous. *Wachter v. Gratech Co., Ltd.,* 2000 ND 62, ¶ 17, 608 N.W.2d 279. The trial court's findings in this regard were not induced by an erroneous view of the law, and we are not left with a definite and firm conviction a mistake has been made. We conclude the trial court's findings that Lavilla's services were not exceptional or extraordinary, and there was no express or implied contract for compensation are not clearly erroneous.

## III

[¶ 15] Lavilla argues the trial court erred in determining that she voluntarily entered into the premarital agreement and consent to will with Emanuel because she lacked independent legal representation and because Emanuel's unfulfilled oral promise fraudulently induced her to sign the documents.

[¶ 16] At the time the premarital agreement was executed and when Emanuel died, N.D.C.C. § 30.1–05–04 [1] allowed a spouse to waive his or her rights of homestead, inheritance, succession, surviving spouse or family allowance, and exempt property. A valid premarital agreement under the Uniform Premarital Agreement Act, N.D.C.C. ch. 14–03.1, may constitute such a waiver. *See Lutz I,* at ¶¶ 23–27. Enforceability of a premarital agreement is governed by N.D.C.C. § 14–03.1–06(1)(a), which provides "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves . . . [t]hat party did not execute the agreement voluntarily."

[¶ 17] Lavilla contends she entered into the premarital agreement involuntarily because Emanuel orally promised to provide for her outside of the documents she signed. She also argues the documents were involuntarily entered into because she believed Tschider was representing her and he did not advise her to obtain independent counsel. Lack of legal advice to a prospective spouse to obtain independent counsel is a significant factor in weighing the voluntariness of a premarital arrangement, but the presence of indepen-

---

**1.** This statute has since been amended and renumbered as N.D.C.C. § 30.1–05–07. *See* *Lutz I,* 563 N.W.2d 90, 1997 ND 82, ¶ 23 n. 1.

dent counsel is not a prerequisite to enforceability. *Lutz I*, at ¶¶ 31, 34.

[¶ 18] Tschider and Schneider testified that Emanuel and Lavilla had discussed the $15,000 buy-out arrangement, and Lavilla expressed no objection when the subject was discussed in their presence. Tschider denied Emanuel made additional oral promises to Lavilla during their meetings, and testified there were no tax considerations involved. Schneider testified neither Emanuel nor Lavilla informed her about any promise to provide Lavilla with additional income. Tschider testified he made it clear to Lavilla that he was drafting the documents for Emanuel and told her that after he mailed the documents to Lavilla, she should take them to be reviewed by her attorney. Tschider testified Lavilla "[v]oiced no concern, voiced no objection. I understood that she was understanding it and that's what she was going to do." Tschider testified one of the reasons he removed the $15,000 buy-out provision was because "her attorney would review it." Schneider testified Lavilla told her "she was very happy with everything" and did not need to discuss the documents with her daughters. Lavilla acknowledged she had full opportunity to have the documents reviewed during the eight months before they were signed, but did not do so.

[¶ 19] The trial court rejected Lavilla's claim that she signed the premarital agreement involuntarily:

> [Lavilla] asserts that she was not properly advised that the lawyer drafting the documents was not representing her. Also, she contends that her trust in Emanuel and reliance on assurances of other provisions for her future security amounted to constructive fraud, which induced her to execute the documents. In finding that the documents executed in anticipation of marriage are valid and enforceable, the Court concludes that [Lavilla's] evidence falls short in this area, as well. The testimony does not establish that Lavilla was induced to enter the agreements based on oral promises to provide otherwise than as set forth in Emanuel's will. While he may have implied his desire to leave her additional things, the record fails to support the present contention that she would not have entered the marriage or would have held out for additional property. In fact, the testimony adopted by the Court is that the $15,000 buy-out provision, which could have resulted in her receiving significantly less value, would have, if it had not been changed by the attorney, been acceptable to her, as well.
>
> There was an extensive period of time between the drafting of the prenuptial agreements and wills and their actual execution just prior to the marriage. The amount of time that was available for reconsideration or for obtaining legal counsel on her own mitigates against Lavilla's argument at this time that she did not enter the agreements voluntarily. Although counsel for Lavilla has portrayed that she was naive, and controlled by Emanuel in the process of entering these agreements, that is not borne out by the Court's impression of [Lavilla]. She was a very articulate, although sometimes evasive witness. She was a licensed real estate agent at the time of these agreements and was not oblivious to the meaning of contracts, consideration in contracts and at least basic knowledge of the concepts of representation present in agency and attorney/client relations. Her testimony suggesting otherwise is not deemed completely credible by this Court.

[¶ 20] The trial court impliedly found Tschider told Lavilla he was not representing her and she should seek independent counsel to review the agreement. The trial court also impliedly found Emanuel did not fraudulently induce her to enter into the agreement. These findings, and the court's other predicate findings of fact, are not clearly erroneous and support the trial court's conclusion Lavilla entered into the premarital agreement voluntarily.

## IV

[¶ 21] Lavilla contends the trial court erred in ruling the premarital agreement was not unconscionable when executed or in its result.

[¶ 22] Substantive enforceability of premarital agreements is governed by N.D.C.C. § 14–03.1–06(1)(b), (2) and (3), which provides:

1. A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

. . . .

  b. The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

  (1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

  (2) Did not voluntarily sign a document expressly waiving any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

  (3) Did not have notice of the property or financial obligations of the other party.

2. If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

3. An issue of unconscionability of a premarital agreement is for decision by the court as a matter of law.

[¶ 23] In addition, N.D.C.C. § 14–03.1–07 supplements the unconscionability standards of N.D.C.C. § 14–03.1–06:

Notwithstanding the other provisions of this chapter, if a court finds that the enforcement of a premarital agreement would be clearly unconscionable, the court may refuse to enforce the agreement, enforce the remainder of the agreement without the unconscionable provisions, or limit the application of an unconscionable provision to avoid an unconscionable result.

[¶ 24] The trial court ruled the premarital agreement was not unconscionable when executed, finding there had been full disclosure of Emanuel's assets to Lavilla. The trial court also found Emanuel's estate had a value of approximately $400,000 and Lavilla's right to occupancy of the duplex had a current value to her of $90,000. On remand after *Lutz II*, the trial court reversed its earlier ruling that the premarital agreement was unconscionable in result, and that Lavilla was entitled to support necessary to avoid eligibility for government assistance because she did not receive disposable liquid assets. Instead, the court ruled the unconscionability provisions of N.D.C.C. § 14–03.1–06(2) did not apply, enforcement of the agreement was not clearly unconscionable under N.D.C.C. § 14–03.1–07, and Lavilla was not entitled to support from the estate.

[¶ 25] In *Lutz I*, at ¶¶ 44–45, this Court relied on the Prefatory Note to the Uniform Premarital Agreement Act in construing N.D.C.C. §§ 14–03.1–06(2) and 14–03.1–07 to support the proposition that the unconscionability provisions applied at the time of death, as well as at the time of separation or marital dissolution. *See also* N.D.C.C. § 14–03.1–03(1)(c) ("Parties to a premarital agreement may contract with respect to . . . [t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event."). Unconscionability can be measured at various times under the Act. However, all of the unconscionability provisions do not apply at the time of death. Section 14–03.1–06(2), N.D.C.C., by its very terms applies only "at the time of

separation or marital dissolution."[2] Therefore, although unconscionability considerations do apply at the time of death, unconscionability at the time of death is not governed by N.D.C.C. § 14–03.1–06(2), but by the unconscionability provisions of N.D.C.C. § 14–03.1–07, which speaks to the unconscionability of the enforcement of the agreement. Unconscionability at the time the agreement was executed is governed by N.D.C.C. § 14–03.1–06(1)(b), unconscionability at the time of separation or marital dissolution is governed by N.D.C.C. § 14–03.1–06(2), and unconscionability that may result from enforcement at any time, including the time of death, is governed by N.D.C.C. § 14–03.1–07. Consequently, the trial court correctly concluded N.D.C.C. § 14–03.1–06(2) was inapplicable under these circumstances, and the proper statute for analyzing unconscionability at the time of Emanuel's death was N.D.C.C. § 14–03.1–07.

[¶ 26] The trial court ruled the "enforcement of the marriage agreement is not clearly unconscionable under N.D.C.C. § 14–03.1–07 and this Court deems it appropriate to enforce the marriage agreement in its entirety." We are not convinced the trial court's findings are clearly erroneous that Lavilla received full information and fair disclosure of Emanuel's assets, that the estate valuation is $400,000, and that the valuation of Lavilla's right of occupancy of the duplex is $90,000. Lavilla and Emanuel were married about six and one-half years. After Emanuel's death, Lavilla received their joint bank account with a $2,000 balance, the family automobile, household goods and the right to live in the duplex for the rest of her life or until she remarried, and was liable to pay only the utilities. She receives social security and Emanuel's military pension. The only remaining assets of Emanuel's estate were the two Bismarck duplexes and the farmland, which Lavilla clearly understood were supposed to be reserved for Emanuel's children and grandchildren as a condition of the marriage. Lavilla voluntarily entered into the agreement, and has received exactly what she agreed to receive.

[¶ 27] We conclude the trial court did not err in ruling the premarital agreement was not unconscionable when executed, or in its result at the time of Emanuel's death.

### V

[¶ 28] Lavilla argues the trial court erred in ruling she had no intestate rights.

[¶ 29] Article II of Emanuel's will contains his specific bequests to Lavilla. Article III of the will addresses the residuary estate, and provides "[i]n the event Lavilla Oswald does not survive me," all of the remainder of Emanuel's estate would pass to his children. Lavilla argued that because she survived Emanuel, the residuary clause fails and the residuary passes under intestate succession, entitling her to one-half of the residuary under N.D.C.C. §§ 30.1–04–01 and 30.1–04–02(4).

[¶ 30] However, Lavilla specifically waived any right of inheritance and succession in the valid and enforceable premarital agreement and consent to will. *See Lutz I*, at ¶ 51. Moreover, we agree with the trial court's conclusion that the opening line of the residuary clause was a "drafting error."

2. After the documents in this case were signed and Emanuel died, the Legislature enacted N.D.C.C. § 30.1–05–07(2)(a), which currently provides:

A surviving spouse's waiver is not enforceable if the surviving spouse proves that:
a. The waiver, if given effect, would reduce the assets or income available to the surviving spouse to an amount less than those allowed for persons eligible for medical or other forms of assistance from any state or federal government or governmental agency for which the surviving spouse must qualify on the basis of need;

. . .

The statute does not apply in this case. *See Lutz I*, at ¶ 42 n. 5; *Lutz II*, at ¶ 12 (Glaser, S.J., dissenting).

An ambiguity exists in the will created by the opening line of the residuary clause (Article III) which is irreconcilable with Article II of the will. To resolve this ambiguity and determine the testator's intent, the Court is permitted to look at extrinsic evidence. The significant record in this case clearly establishes the testator's intent to limit the devise to Lavilla to specific property and to provide for his children and grandchildren by devising everything not specified for Lavilla to them. *See Lutz I*, at ¶¶ 47–51.

[¶ 31] We conclude the trial court did not err in ruling Lavilla has no intestate rights in Emanuel's estate.

## VI

[¶ 32] Lavilla argues the trial court erred in determining that she was not entitled to an award of her litigation expenses and attorney fees from the estate.

[¶ 33] Attorney fees are not allowed to a successful litigant unless expressly authorized by statute or agreement. *See, e.g., Erway v. Deck*, 1999 ND 7, ¶ 14, 588 N.W.2d 862. Not only is Lavilla an unsuccessful litigant in this case, but she has cited no statutory authority or agreement supporting her request for litigation expenses and attorney fees. Consequently, the trial court did not err in denying her request.

## VII

[¶ 34] In view of our disposition of Lavilla's appeal, it is unnecessary for us to address the issue raised in the cross-appeal. The orders appealed from are affirmed.

[¶ 35] SANDSTROM, J., JAMES H. O'KEEFE, S.J., GERALD G. GLASER, S.J., KAPSNER, J., concur.

[¶ 36] The Honorable GERALD G. GLASER, S.J., and the Honorable JAMES H. O'KEEFE, S.J., sitting in place of MARING, J., and VANDE WALLE, C.J., disqualified.